*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 22-CO-0650

LEONARD E. BISHOP, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court of the
District of Columbia
(1994-FEL-012247)

(Hon. Jason Park, Trial Judge)

(Argued October 18, 2023                     Decided February 29, 2024)

*Cecily E. Baskir* for appellant.

*Mark Hobel*, Assistant United States Attorney, with whom *Matthew M. Graves*, United States Attorney, *Chrisellen R. Kolb*, and *Nicholas P. Coleman*, Assistant United States Attorneys, were on the brief for appellee.

Before HOWARD and SHANKER, *Associate Judges*, and STEADMAN,[*] *Senior Judge*.

---

[*] Associate Judge AliKhan was originally assigned to this case. Following her appointment to the U.S. District Court for the District of Columbia, effective December 12, 2023, Judge Steadman has been assigned to take her place on the panel. *See* Administrative Order 1-24.

SHANKER, *Associate Judge*: This post-conviction matter arises out of a motion by appellant Leonard Bishop under the Incarceration Reduction Amendment Act, D.C. Code § 24-403.03 ("IRAA"). The IRAA provides for a second look at lengthy prison sentences for individuals convicted of offenses they committed before the age of twenty-five. Mr. Bishop and his co-defendant, Rodney Brown, were convicted in 1996 of multiple offenses, including first-degree murder while armed, in connection with a shooting that left one person dead. Mr. Bishop was sentenced to life in prison. This court affirmed Mr. Bishop's convictions on direct appeal.

In 2022, Mr. Bishop filed a motion for early release under the IRAA. The trial court denied his motion. Although Mr. Bishop had demonstrated some progress toward rehabilitation, the trial court held that other factors, such as the violent nature of the underlying offense and his disciplinary history while incarcerated, counseled against early release.

We conclude that the trial court misapplied one of the statutorily enumerated IRAA factors. We therefore vacate the order and remand to the trial court for reconsideration in light of this opinion.

# I.  Background

## A.

We derive the following facts from the IRAA order on appeal, which followed a hearing.  On November 25, 1994, Metropolitan Police Department officers responded to a shooting at the 600 block of 46th Place, SE, Washington, D.C.  Upon arrival, officers found several people suffering from gunshot wounds, including Andre Newton, who later died from his wounds, and Carrington Harley, who was seriously injured.  At least two others were injured as well.  Officers arrested Mr. Bishop and Mr. Brown the following month in connection with the shooting.  Mr. Bishop was nineteen years old at the time of the incident.

A grand jury returned an indictment charging both Mr. Bishop and Mr. Brown with one count of first-degree murder while armed, five counts of possessing a firearm during a crime of violence, four counts of assault with the intent to kill while armed, one count of mayhem while armed, and one count of carrying a pistol without a license.  In 1996, after a joint trial, a jury found both defendants guilty on all counts.  The trial court sentenced Mr. Bishop to 101 years and 8 months to life in prison.  This court affirmed Mr. Bishop's and Mr. Brown's convictions on direct appeal.  *See Brown v. United States*, 934 A.2d 930 (D.C. 2007).

**B.**

Following his direct appeal, Mr. Bishop filed a number of collateral challenges to his convictions or sentence or otherwise sought early release.[1] Underlying this appeal is Mr. Bishop's 2022 motion for a reduced sentence under the IRAA, D.C. Code § 24-403.03. The IRAA provides that a court shall reduce the sentence of an eligible defendant if the court finds, after considering eleven enumerated factors, that the defendant is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification.

In his motion, which he supported with over fifty exhibits, Mr. Bishop argued that he "has matured from a troubled youth born into adversity into a responsible adult who deserves a second chance at liberty" and that the "IRAA's statutory factors weigh in favor of modifying [his] sentence." Mr. Bishop highlighted, among other things, his advancements and successes while incarcerated; letters supporting his release by "numerous individuals, including jail wardens and program supervisors"; and expert reports attesting to his lack of dangerousness and suitability for reentry

---

[1] Mr. Bishop collaterally challenged his sentence under D.C. Code § 23-110 and moved for emergency compassionate release on April 10, 2020, during the COVID-19 pandemic; the trial court denied both motions. This court affirmed both denials. Mr. Bishop and Mr. Brown also filed a consolidated motion under the Innocence Protection Act, D.C. Code § 22-4131 et seq., which remains pending in Superior Court.

into the community.  The government opposed Mr. Bishop's motion, largely on the basis of his "lengthy and concerning disciplinary history."  The government also noted that several victims objected to Mr. Bishop's early release; that Mr. Bishop lacked significant vocational training; and that Mr. Bishop "has yet to demonstrate his acceptance of responsibility" for his offenses.

The trial court held a hearing on Mr. Bishop's IRAA motion.  Mr. Bishop called several witnesses, including a D.C. Jail official in charge of educational and vocational training, a former corrections officer, and a clinical and forensic psychologist.

The trial court issued an order denying Mr. Bishop's IRAA motion, reviewed in more detail below.  After reviewing the eleven factors set forth in D.C. Code § 24-403.03(c), the court first concluded that Mr. Bishop failed to "establish[ ] his lack of dangerousness" due to the violent nature of his offense and his disciplinary record while incarcerated.  Although Mr. Bishop had "taken steps to rehabilitate himself and prepare himself for reentry into society," the trial court noted "a number of . . . high severity offenses" that involved "violence or the possession of dangerous weapons."  Second, the court found that the interests of justice did not weigh in favor of early release.  The trial court acknowledged that Mr. Bishop has "served almost three decades and nearly his entire adult life in prison."  Nevertheless, the "heinous,

violent" nature of the underlying offenses, opposition from the victims, and Mr. Bishop's disciplinary record while incarcerated counseled against his early release.

This appeal followed.

## II.     Legal Background and the Trial Court's Order

### A.

Originally passed by the District of Columbia Council in 2016, the IRAA "establishes a sentence review procedure intended to . . . ensur[e] that all juvenile offenders serving lengthy prison terms have a realistic, meaningful opportunity to obtain release based on their diminished culpability and their maturation and rehabilitation." *Williams v. United States*, 205 A.3d 837, 846 (D.C. 2019). The function of the IRAA is to provide a "second look" at lengthy prison sentences for individuals convicted of offenses they committed before the age of twenty-five. Comm. on the Judiciary and Pub. Safety, Rep. on B23-0127, the "Omnibus Public Safety and Justice Amendment Act of 2020" at 18 (Nov. 23, 2020) ("2020 Committee Report").

The Council initially passed the IRAA in response to several "constitutional imperatives" declared by the Supreme Court in a series of cases holding that the

Eighth Amendment prohibits sentences of life without parole for juvenile offenders. *Williams*, 205 A.3d at 846; *see Roper v. Simmons*, 543 U.S. 551 (2005); *Graham v. Florida*, 560 U.S. 48 (2010); *Miller v. Alabama*, 567 U.S. 460 (2012). For those already sentenced to life without parole, "the Eighth Amendment does not require States 'to guarantee eventual freedom' to juvenile offenders who are ineligible for [life-without-parole] sentences." *Williams*, 205 A.3d at 845 (quoting *Miller*, 567 U.S. at 479). Instead, "[t]he Eighth Amendment demands only that those offenders be afforded 'some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.'" *Id.* (quoting *Miller*, 567 U.S. at 479). The IRAA provides just such an opportunity. *Id.* at 849.

Underlying both the IRAA and the Supreme Court's Eighth Amendment juvenile jurisprudence is a body of scientific evidence "demonstrat[ing] that the frontal lobes of the brain, which control executive functions like planning, working memory, and impulse control . . .[,] may not be fully developed until the mid-twenties." Comm. on the Judiciary, Rep. on B21-0683, the "Comprehensive Youth Justice Amendment Act of 2016," at 3 (Oct. 5, 2016) ("2016 Committee Report"). "As a result, adolescents have a more difficult time grasping long-term consequences and are more likely to have impaired judgment[.]" *Id.* Juveniles and young adults may exhibit a "lack of maturity and an underdeveloped sense of responsibility," heightened "susceptib[ility] to negative influences and outside

pressures, including peer pressure," and a "more transitory, less fixed" personality than older adults. *Roper*, 543 U.S. at 569-70 (internal quotation marks omitted). Youth raised in unstable, violence-ridden circumstances are particularly vulnerable. *See Miller*, 567 U.S. at 471 ("[C]hildren are more vulnerable to negative influences . . .[,] have limited control over their own environment[,] and lack the ability to extricate themselves from horrific, crime-producing settings.") (internal quotation marks and alterations omitted). Young offenders therefore possess "reduced culpability" for their crimes and an increased "capacity for rehabilitation and growth." 2016 Committee Report at 4; *see Montgomery v. Louisiana*, 577 U.S. 190, 195 (2016). Accordingly, "none of the goals of penal sanctions that have been recognized as legitimate—retribution, deterrence, incapacitation, and rehabilitation—provides an adequate justification" for sentences of life without parole for young offenders, who must be provided a meaningful opportunity for release. *Graham*, 560 U.S. at 71 (citation omitted).

Following these principles, under the IRAA, a court "shall reduce a term of imprisonment imposed upon a defendant for an offense committed before the

defendant's 25th birthday" if two conditions are satisfied.[2]  D.C. Code § 24-403.03(a).  First, the defendant must have been "sentenced pursuant to § 24-403 or § 24-403.01" or "committed pursuant to § 24-903" and have "served at least 15 years in prison."  *Id.* § 24-403.03(a)(1).  Second, the court must find, "after considering the factors set forth in subsection (c) . . ., that the defendant is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification."  *Id.* § 24-403.03(a)(2).  Before deciding whether the movant satisfies these conditions, the trial court must "hold a hearing on the motion at which the defendant and the defendant's counsel shall be given an opportunity to speak[.]"  *Id.* § 24-403.03(b)(2).  The court "may permit the parties to introduce evidence" and "may consider any records related to the underlying offense."  *Id.*  The burden of proof is on the movant.  *Williams*, 205 A.3d at 850.[3]

---

[2] The IRAA, as originally passed, extended relief to movants who committed the underlying offense before their eighteenth birthday.  *Compare* D.C. Code § 24-403.03(a) (2017) *with* D.C. Code § 24-403.03(a) (2019).  The Council relied on largely the same scientific foundation when it expanded the IRAA's reach to individuals who committed the underlying offense before their twenty fifth birthday. *See* 2020 Committee Report at 15-16.

[3] The trial court assessed Mr. Bishop's motion under a preponderance-of-the-evidence standard.  Mr. Bishop argues that "the appropriate burden of proof on an IRAA applicant is the same reasonable probability standard as for parole." Mr. Bishop raised this argument for the first time in his reply brief.  Accordingly, we do not address it.  *See Cummings v. Department of Motor Vehicles*, 294 A.3d 121, 128 (D.C. 2023) ("We generally will not consider arguments raised for the first time in a reply brief.").

Despite its broadly applicable scientific basis, the IRAA's focus is "individualized" and a court must take into account the idiosyncratic characteristics of the movant, both at the time he or she committed the offense and at the time of the motion. *See id.* at 853; *see also* 2020 Committee Report at 14.

When considering a motion to reduce a term of imprisonment under the IRAA, the trial court must review the following eleven factors before determining whether the movant is a danger to any person or the community and whether the interests of justice warrant a sentence modification:

(1) The defendant's age at the time of the offense;

(2) The history and characteristics of the defendant;

(3) Whether the defendant has substantially complied with the rules of the institution to which the defendant has been confined, and whether the defendant has completed any educational, vocational, or other program, where available;

(4) Any report or recommendation received from the United States Attorney;

(5) Whether the defendant has demonstrated maturity, rehabilitation, and a fitness to reenter society sufficient to justify a sentence reduction;

(6) Any statement, provided orally or in writing, provided pursuant to § 23-1904 or 18 U.S.C. § 3771 by a victim of the offense for which the defendant is imprisoned, or by a family member of the victim if the victim is deceased;

(7) Any reports of physical, mental, or psychiatric examinations of the defendant conducted by licensed health care professionals;

(8) The defendant's family and community circumstances at the time of the offense, including any history of abuse, trauma, or involvement in the child welfare system;

(9) The extent of the defendant's role in the offense and whether and to what extent another person was involved in the offense;

(10) The diminished culpability of juveniles and persons under age 25, as compared to that of older adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime, and the defendant's personal circumstances that support an aging out of crime; and

(11) Any other information the court deems relevant to its decision.

D.C. Code § 24-403.03(c)(1)-(11). Section 24-403.03(b)(4) states that the trial court "shall issue an opinion in writing stating the reasons for granting or denying the application under this section . . ."; and, to ensure this court's ability to adequately review its decision, the trial court must make clear in that written opinion how the statutory factors informed its determinations regarding dangerousness and the interests of justice.

If the trial court "denies or grants only in part" the motion, the movant may file a second motion after three years and a third motion three years after the trial court "denies or grants only in part" the second motion. *Id.* § 24-403.03(d). "No court shall entertain a 4th or successive" motion. *Id.*

**B.**

After holding an evidentiary hearing, the trial court issued a written order denying Mr. Bishop's motion. The trial court first considered Mr. Bishop's threshold eligibility for IRAA relief under Section 24-403.03(a)(1). It concluded that Mr. Bishop was eligible for IRAA relief because he "was 19 years old at the time of his crime, was sentenced pursuant to § 24-403, and has served over 27 years in prison." The court then turned to the eleven factors set forth in Section 24-403.03(c).

As to the first factor—the defendant's age at the time of the offense—the trial court noted that Mr. Bishop was nineteen when he committed the underlying offenses.

The second factor requires the trial court to consider the history and characteristics of the movant. Mr. Bishop's childhood was marked by "great[ ] hardship and trauma." He was raised "in a single-parent household, with minimal

supervision" and lacked "a positive male role model." Mr. Bishop's father—whom he rarely saw—was addicted to heroin; his mother often gambled. To help provide for his family, Mr. Bishop's older brother began dealing drugs at fifteen. Mr. Bishop dropped out of school completely at sixteen with a sixth-grade education. He also was regularly exposed to community violence and crime. Mr. Bishop was shot on two different occasions before he turned sixteen, including once as an infant. His "uncles and older cousins often forced him to fight and would hit him repeatedly in order to 'toughen him up.'"

Mr. Bishop had a lengthy juvenile record, "consist[ing] of nine arrests and three adjudications for tampering with an automobile, unlawful entry, and assault with a dangerous weapon." His adult record "indicates a number of unauthorized use, burglary, and drug-related charges." The trial court weighed this factor in favor of Mr. Bishop, noting that he "did not have a highly structured or stable home environment and had experienced a notable amount of neglect throughout his childhood."

Under the third factor, the court considers whether "the defendant has substantially complied with the rules of the institution to which [he or she] has been confined, and whether the defendant has completed any educational, vocational, or other" programming. D.C. Code § 24-403.03(c)(3). Mr. Bishop has been

incarcerated since his arrest in December 1994 and has spent time at several different state and federal facilities. Between 1994 and 2002, Mr. Bishop was principally imprisoned in Washington, D.C., and Virginia. Between 2002 and 2018, Mr. Bishop was transferred to federal custody under the Bureau of Prisons ("BOP") and was imprisoned in a number of facilities across the country before returning to D.C. Department of Corrections custody.

Mr. Bishop has incurred eighteen disciplinary infractions during his time in BOP custody.[4] Although the trial court expressed concern about the sheer number

---

[4] The full list of infractions is as follows:

- December 2002: refusing to obey an order; possession of an unauthorized item.
- January 2003: possession of a dangerous weapon.
- February 2004: insolence toward a staff member; refusing a work assignment.
- May 2004: absence from a work assignment.
- January 2005: assault without serious injury infraction; phone abuse.
- March 2005: refusing a work assignment; refusing to obey an order.
- April 2005: unauthorized use of mail.
- August 2005: possession of a dangerous weapon.
- July 2009: possession of a dangerous weapon.
- December 2011: refusing to obey an order.
- May 2012: giving or accepting money without authority.

of infractions, it placed greater weight on "the fact that of the eighteen infractions, seven were categorized as level 100 or 200 offenses, the highest severity levels in the BOP's categorization system, including repeated infractions for possession of dangerous weapons violations, as well as multiple infractions for fighting and assault."[5] Of particular note, Mr. Bishop stabbed another inmate in the chest and shoulder in 2012. Although Mr. Bishop maintained his innocence, a BOP disciplinary hearing officer found, by a preponderance of the evidence, that Mr. Bishop committed the stabbing. Similarly, in 2016, a BOP employee observed Mr. Bishop "striking [an inmate] with [a] closed fist to the head and upper torso area."[6]

---

- July 2012: assault with serious injury.
- February 2014: giving or accepting money without authority.
- February 2016: fighting with another inmate.

[5] The level of the offense refers to its severity; offenses range from the 100s level, the most severe, to the 400s level, the least severe. *See* 28 C.F.R. § 541.3.

[6] Mr. Bishop attached an affidavit by Jack Donson—a former correctional officer and private consultant who "provide[s] expert witness testimony on [BOP] issues"—as an exhibit to his IRAA motion. Mr. Donson also testified during the June 2016 evidentiary hearing. As to Mr. Bishop's disciplinary history, Mr. Donson explained that "Mr. Bishop had the typical adjustment young adults experience after transferring from the DC prison system to a crowded BOP penitentiary environment." Indeed, Mr. Bishop's record was "actually a little less than what [Mr. Donson] usually see[s] for someone . . . serving that much time coming as a youthful person into a penitentiary setting." Mr. Donson "often see[s] far more

With respect to his institutional programming, Mr. Bishop earned his GED in 2001 but completed only 131 hours of education courses and held a number of work assignments between 2002 and 2016. He received good remarks and "on numerous occasions was recommended for a bonus." The trial court also noted that since 2018, "Mr. Bishop has taken far greater advantage of educational, vocational, and other available programming." Mr. Bishop has taken several college level courses and has served as a tutor and mentor for the D.C. Department of Corrections' GED Unit and LEAD Up! Program. He received "notable recognition from both correctional staff and fellow inmates for his efforts and success as a mentor."

In weighing the third factor, the trial court recognized "Mr. Bishop's seemingly robust efforts toward self-improvement" since 2018, noting his "coursework, outstanding performance evaluations as a tutor and mentor, and the glowing referrals of [Department of Corrections] staff and inmates." These accomplishments, however, were tempered by his "modest level of program participation and achievement in the preceding years[.]" As for his disciplinary history, the trial court expressed concern at the number and nature of his recent

---

serious violations . . . of the greatest severity, far more weapons possessions [and] assaults." The trial court acknowledged Mr. Donson's affidavit but discounted his findings because "Mr. Bishop was 37 years old [at the time of the assault] in July 2012 and had been housed in the BOP system for a decade. Furthermore, the typicality of Mr. Bishop's disciplinary record does not speak directly to whether Mr. Bishop presently is not a danger to the safety of any person or the community."

infractions, which "weigh[ed] against a finding of rehabilitation and non-dangerousness."

Under the fourth factor, the court noted that the U.S. Attorney for the District of Columbia opposed Mr. Bishop's request for a sentence reduction, largely due to Mr. Bishop's "'lengthy and concerning disciplinary history' and his failure to demonstrate responsibility for his conduct and empathy for his victims."

On the fifth factor—concerning whether the movant has demonstrated maturity, rehabilitation, and fitness to reenter society—the trial court noted a mixed record. The court credited Mr. Bishop's "increased maturity and rehabilitation" since 2018 and the "life experiences" he has faced while incarcerated, including the passing of his father, a cancer diagnosis, and the "growing relationships with his current partner and family members." Several family members and inmates have expressed their support for his release, and Mr. Bishop has outlined a release plan which includes plans for housing, employment, and connection to support organizations. On the other hand, the trial court found that "much of the record supporting Mr. Bishop's rehabilitation is relatively recent" and that many of the "turning point moments identified by the defense pre-date serious disciplinary infractions[.]" Accordingly, the trial court declined to weigh this factor in favor of Mr. Bishop. It noted, however, that "[s]hould Mr. Bishop continue down the path

of self-improvement and rehabilitation . . . the record might well support a different finding."

Regarding the sixth factor, Michael Toland, a victim of the underlying offense, supported Mr. Bishop's release. Mr. Toland expressed his belief that Mr. Bishop "has drastically change[d] from the troubled youth of his past into a man worthy of a second chance to become a productive citizen in society." The trial court also received victim statements from Carrington Harley and the family of deceased victim Andre Newton opposing Mr. Bishop's motion. Both statements described feeling "greatly disturbed" by Mr. Bishop's continued claim of innocence and his failure to voice remorse for his crime.

The seventh factor instructs courts to consider examinations of the defendant conducted by medical professionals. Mr. Bishop provided a mental health evaluation report opining that he "presents a low risk for future criminality and interpersonal violence." Although Mr. Bishop had not accepted responsibility for the offense, the evaluation concluded that acceptance of responsibility is not significant for purposes of an evaluation of dangerousness or rehabilitation. Furthermore, the evaluation "dismissed the relevance of Mr. Bishop's criminal behavior prior to incarceration and his disciplinary history during incarceration" on

the ground that Mr. Bishop no longer finds himself in the circumstances that gave rise to those offenses and infractions.

As to factor eight—the defendant's family and community circumstances at the time of the offense—the trial court found that, "[f]rom infancy, Mr. Bishop's home environment was neither stable nor secure." Mr. Bishop's siblings took to selling drugs at a young age due to their circumstances. As noted above in factor two, crime and violence were rampant outside the home. Mr. Bishop was shot twice during his childhood and witnessed a murder at eleven years old. Mr. Bishop's psychiatric evaluation concluded that, as a result of years of neglect, "Mr. Bishop never received the support and guidance necessary during his childhood to develop into a law-abiding citizen." The trial court concluded that the trauma suffered by Mr. Bishop "cannot be divorced from the violence that Mr. Bishop was convicted of committing as a nineteen-year-old man."

As to factor nine, Mr. Bishop and the government "wholly disagree[d] with respect to Mr. Bishop's role in the shooting[.]" The trial court, however, found that the evidence "introduced at trial indicated that this was not a crime of sudden passion but rather a deliberate act of violence that culminated in the death of Mr. Newton and the injury of four others." Although the evidence introduced against Mr. Brown was more substantial than that against Mr. Bishop, the trial court concluded that "the

fact remains that the jury convicted both defendants of directly participating in extraordinarily violent acts."

Under factor ten, the trial court noted that Mr. Bishop was nineteen at the time of his offense and that "Mr. Bishop's age and circumstances at the time of the offense surely contributed to his actions that day." Nevertheless, Mr. Bishop's "record of violence and criminality before and, particularly, after the day of the offense weigh, to some degree, against a finding of mere youthful impulsiveness." Although the current version of factor ten also instructs courts to consider "the defendant's personal circumstances that support an aging out of crime," the trial court appears to have relied on an older version of the statute and did not address this provision.

The court did not consider any other information under factor eleven.

After assessing the enumerated factors, the court turned to the dangerousness and interests-of-justice analyses. As to dangerousness, the court weighed the number and severity of Mr. Bishop's recent infractions and the "violence of the offenses for which he was convicted" against the steps Mr. Bishop has taken to rehabilitate himself and his deepened familial relationships. It found that "the evidence, at least at this junction, is insufficient to outweigh the violence of the offenses for which he was convicted and his disciplinary history while incarcerated"

and that Mr. Bishop therefore failed to establish his lack of dangerousness by a preponderance of the evidence. The trial court then also concluded that the interests of justice did not warrant a sentence reduction. Although Mr. Bishop "has served almost three decades and nearly his entire adult life in prison," he committed "heinous, violent acts" and Carrington Harley and the family of Andrew Newton opposed his release. Additionally, the trial court noted that Mr. Bishop "appears to have struggled to comply with the rules of the institutions" in which he was incarcerated, at least until recently. Accordingly, the court denied Mr. Bishop's motion.

### III.   Analysis

### A.

We review the denial of an IRAA motion for abuse of discretion, *Williams v. United States*, 205 A.3d 837, 848 (D.C. 2019), but consider questions of statutory construction de novo, *Eaglin v. District of Columbia*, 123 A.3d 953, 955 (D.C. 2015). In reviewing for abuse of discretion, we "must determine whether the decision maker failed to consider a relevant factor, whether [the decision maker] relied upon an improper factor, and whether the reasons given reasonably support the conclusion." *Crater v. Oliver*, 201 A.3d 582, 584 (D.C. 2019) (internal quotation marks omitted). The trial court must make "[a]n informed choice . . . drawn from a

firm factual foundation." *Brooks v. United States*, 993 A.2d 1090, 1093 (D.C. 2010) (first alteration in original) (internal quotation marks omitted). This court's "role in reviewing the exercise of discretion is supervisory in nature and deferential in attitude." *In re Z.W.*, 214 A.3d 1023, 1037 (D.C. 2019) (internal quotation marks omitted). Nevertheless, "[a] court by definition abuses its discretion when it makes an error of law." *Vining v. District of Columbia*, 198 A.3d 738, 754 (D.C. 2018) (internal quotation marks omitted).

**B.**

Mr. Bishop argues that the trial court abused its discretion by (1) ignoring favorable facts under factor three; (2) applying the incorrect version of factor ten or, at any rate, misinterpreting that factor; (3) failing to consider Mr. Bishop's individualized reduced culpability in its interests-of-justice analysis; and (4) improperly relying on the violent nature of the underlying offense.

We agree with Mr. Bishop that the trial court—in an otherwise thorough and reasoned order—misapplied factor ten in two respects, and we cannot readily conclude that these errors did not affect the court's ultimate decision to deny IRAA relief. We therefore remand for reconsideration in light of this opinion.

### 1. Whether the Trial Court Abused its Discretion in Applying Factor Three

Mr. Bishop argues that the trial court erred in "its assessment of both [Mr.] Bishop's programming and his disciplinary record" because it "improperly disregarded the context of a highly-monitored penitentiary environment and ignored other relevant favorable facts." In Mr. Bishop's view, the trial court's description of his programming as "modest" failed to take into account the nature of his situation while in BOP custody. Relying on Mr. Donson's affidavit, Mr. Bishop maintains that it was "not [his] fault that his programming participation was limited while in BOP custody" because the BOP restricted such opportunities due to "frequent lockdowns and limited program space." Furthermore, "the BOP-prepared education transcript upon which the trial court based its programming calculations does not include all activities and programs in which [Mr.] Bishop participated." As to his disciplinary record, Mr. Bishop maintains that the trial court should have discounted the weight of his infractions because BOP penitentiaries are "violent, predatory, gang-centric environment[s]" in which "inmates feel compelled to carry sharpened instruments for self-protection."

We perceive no abuse of discretion in the trial court's assessment of factor three. To satisfy the abuse-of-discretion standard, a trial court need only make "[a]n informed choice . . . drawn from a firm factual foundation." *Brooks*, 993 A.2d at

1093 (brackets in original) (internal quotation marks omitted). Between the evidentiary hearing and Mr. Bishop's IRAA motion and supporting exhibits, the trial court was well aware of the complexities of prison life as they related to Mr. Bishop's programming and disciplinary history. Contrary to Mr. Bishop's argument on appeal, the trial court specifically acknowledged "the difficulties of offenders assimilating from the local prison environment to federal penitentiaries." It also took into account Mr. Bishop's record as "typical if not a bit less extensive" than other, similarly situated prisoners. The court then thoroughly reviewed Mr. Bishop's disciplinary records, going so far as to recount and weigh individual infractions based on BOP records. As to the 2019 infraction for fighting an inmate, for example, the court concluded that the record "to a degree support[ed]" Mr. Bishop's characterization of the incident and accordingly "consider[ed] but [did] not place significant weight on" the infraction. Similarly, despite Mr. Donson's description of the dangerousness of federal penitentiaries and the "commonplace" "possession of dangerous weapons," Mr. Bishop has never suggested that his most severe infraction—the July 2012 stabbing—was in self-defense. Rather, the trial court found, after parsing the evidence of the July 2012 incident, that Mr. Bishop "direct[ly] participat[ed] in" the "premedi[tated] retaliat[ory] stabbing[.]" The trial court was therefore well within its discretion in

concluding that these infractions weighed "against a finding of rehabilitation and non-dangerousness."

The same conclusion holds with respect to the trial court's description of Mr. Bishop's programming as "modest." Mr. Bishop asserted that "it [was] not [his] fault that his programming participation was limited while in BOP custody" because federal penitentiaries "are less conducive to programming due to frequent lockdowns and limited program space." As with its disciplinary assessment, however, the court was not required to view this context as of overriding importance or excusing what it viewed as Mr. Bishop's programming shortcomings while incarcerated.[7] Similarly, the trial court's reliance on a BOP-prepared education transcript that did "not include all activities and programs in which [Mr.] Bishop participated"—a transcript that Mr. Bishop himself introduced—does not require reversal.[8] The trial court discussed Mr. Bishop's programming and other successes in detail, noting his coursework, work assignments, mentorship, awards, and recommendations. It

---

[7] Of course, we do not discount the possibility that there may be some circumstances in which a lack of programming opportunities mandates a different calculus. *See* D.C. Code § 24-403.03(c)(3) ("Whether . . . the defendant has completed any educational, vocational, or other program, *where available*.") (emphasis added).

[8] Mr. Bishop did present evidence of programming that the transcript did not otherwise capture. Nonetheless, the trial court's failure to include all the evidence presented by Mr. Bishop does not warrant reversal and the court's description of Mr. Bishop's programming as "modest" is supported by the record.

recognized Mr. Bishop's "robust efforts toward self-improvement" and his "outstanding performance evaluations" and referrals. That the court did not mechanically tick off each piece of evidence presented is of no consequence. A "firm factual foundation" for the court's conclusion is sufficient, *Brooks*, 93 A.2d at 1093 (internal quotation marks omitted), and we conclude that one exists here.

### 2. Whether the Trial Court Committed Legal Error in Applying Factor Ten

Mr. Bishop asserts two errors in the trial court's analysis of factor ten. First, he contends that the trial court applied an outdated version of the statute and therefore improperly truncated the factor-ten analysis. Second, he argues that the court erred by "consider[ing] whether [Mr.] Bishop exhibited the hallmark factors of youth (such as impulsiveness) before, during, or after the crime," by relying on Mr. Bishop's "record of violence and criminality." We agree and conclude that these errors warrant reconsideration by the trial court.[9]

---

[9] Mr. Bishop also argues that the trial court "failed to include the amended language" under factor nine by neglecting to substitute "another person" for "adult." Although the trial court used the incorrect language in its "legal standard" section, it used the current, amended language in its analysis of factor nine. *Compare* D.C. Code § 403.03(c)(9) (2021) *with* D.C. Code § 403.03(c)(9) (2019).

### a. Outdated Version of Factor Ten

Under the current version of factor ten, the trial court must consider:

> The diminished culpability of juveniles and persons under age 25, as compared to that of older adults, and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime, *and the defendant's personal circumstances that support an aging out of crime*[.]

D.C. Code § 24-403.03(c)(10) (2021) (emphasis added). The D.C. Council added the "aging out of crime" clause on January 13, 2021, effective April 27, 2021. *See* Omnibus Public Safety and Justice Amendment Act of 2020, D.C. Law 23-274, 68 D.C. Reg. 47921 § 601 (Apr. 27, 2021). In adopting this language, the Council explained that "[e]xtensive data shows that individuals age out of crime. Criminal behavior predominantly occurs during teenage and young adult years and decreases significantly in the 20s and upward." 2020 Committee Report at 18 (footnote omitted). "This well-documented and widely-accepted phenomenon is known as the 'age-crime curve,' meaning that people desist from committing crimes as they age." *Id.* at 16. In the Committee's view, "[s]uch well-developed data showing that individuals age out of crime may be relevant to a court's decision of whether a defendant is a danger to any other person or the community." *Id.* at 18.

In considering Mr. Bishop's IRAA motion, the trial court appears to have relied on the 2019 version of the statute, which did not contain the "aging out of crime" clause italicized above. The trial court, therefore, was apparently unaware of the need to inquire into Mr. Bishop's "personal circumstances that support an aging out of crime." D.C. Code § 24-403.03(c)(10) (2021). Mr. Bishop argues that, because the trial court omitted the above language, it failed to consider, "for example, [Mr.] Bishop's rehabilitative successes in his 40s, his brain maturation, or that he is no longer facing the circumstances related to his adolescent offenses."

We agree with Mr. Bishop that, in relying on an outdated version of the statute, the trial court "failed to undertake a required factual inquiry." *Johnson v. United States*, 398 A.2d 354, 366 (D.C. 1979). As noted above, juveniles and "[e]merging adults generally display greater risk-seeking behaviors, susceptibility to peers, stress, and excitement, and diminished capacity for self-control" due to an underdeveloped prefrontal cortex region compared to their older-adult counterparts. 2020 Committee Report at 15. In addition to these cognitive differences, juveniles and young adults may also face unique, material challenges. As the Committee notes, many young adults may not be "engaged in school or work, struggle with significant mental health conditions and substance use issues, lack supportive relationships with family and other caring adults, and often experience homelessness." *Id.* Although the Committee did not specify the types of "personal

circumstances" that would "support an aging out of crime," the legislative history of the IRAA suggests that both a movant's age at the time of the motion and changes in his or her material circumstances since the underlying offense are relevant considerations under this clause. Stated more broadly, the purpose of this clause is to mandate consideration of how the movant has changed between the time of the underlying offense and the time of his or her IRAA motion.

By using the previous version of the IRAA, the trial court neglected to consider Mr. Bishop's "personal circumstances" at the time of his motion, particularly as those circumstances relate to an aging out of crime. Although the court considered generally Mr. Bishop's characteristics at the time of the offense, it did not weigh his current age, brain maturation, and likely changes in material circumstances, such as Mr. Bishop's reentry plans, suitability for employment, and current relationships.

The government asserts that the trial court considered Mr. Bishop's current circumstances elsewhere in its order. As support for its assertion, the government points to the court's assessment of Mr. Bishop's rehabilitative successes in factor three and an expert report concerning the brain development of adolescents and young adults that Mr. Bishop submitted. But the court did not address key changes in Mr. Bishop's personal circumstances since the underlying offense, particularly as

those changes relate to an aging out of crime. The order omits, for example, Mr. Bishop's detailed reentry plan, which encompassed living arrangements, employment, transportation, social support, and community engagement. Similarly, the trial court did not address how Mr. Bishop's current age and brain maturation may support a finding that he has aged out of crime.

To be sure, a trial court's decision not to robustly discuss every piece of evidence under each relevant factor might not, by itself, warrant reversal. And the trial court may find on remand that Mr. Bishop's current circumstances do not support an aging out of crime or otherwise alter its overall assessment of factor ten. Nevertheless, where the trial court both cited outdated statutory language and neglected to discuss the considerations reflected in the current version of the statute, we are unable to conclude, when considering this error together with the one discussed below, that the court would have reached the same result, including in its ultimate determinations regarding dangerousness and interests of justice, if it had used the amended language. We presume that when the Council added this language to factor ten, it intended that courts would affirmatively consider defendant-specific circumstances related to the age-crime curve. *See Stone v. I.N.S.*, 514 U.S. 386, 397 (1995) ("When [a legislative body] acts to amend a statute, we presume it intends its amendment to have real force and substantial effect."). We therefore remand for that purpose.

### b. *Whether Mr. Bishop Exhibited the "Hallmark Features of Youth" in Committing the Underlying Offense*

Mr. Bishop next argues that the trial court exceeded its discretion under factor ten by "consider[ing] whether [Mr.] Bishop exhibited the hallmark factors of youth (such as impulsiveness) before, during, or after the crime." According to Mr. Bishop, "factor 10 is silent about the particulars of an individual defendant" and "does not give the court a choice at all *whether* to find diminished culpability." Thus, Mr. Bishop views the first clause of the tenth factor as weighing categorically in favor of the movant in all cases and precluding the court from considering whether or to what extent a particular movant exhibited the "hallmark features of youth" at the time he or she committed the crime. The government, meanwhile, argues that factor ten simply requires courts to "acknowledge that youth may play a mitigating role" in the underlying offense, but that the court has discretion to consider the *degree* to which the qualities of youth were at play in the commission of the underlying offense. We agree with Mr. Bishop and hold that factor ten must weigh categorically in favor of the movant in all cases and that a trial court may not consider the degree to which the "hallmark features of youth" played a role in the underlying offense. Again, we cannot be confident that the trial court's error in this regard, when combined with its use of the prior version of factor ten, did not influence the court's dangerous and interests-of-justice determinations.

The first clause of factor ten requires trial courts to "consider . . . [t]he diminished culpability of juveniles and persons under age 25 . . . and the hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing them to lengthy terms in prison, despite the brutality or cold-blooded nature of any particular crime."  D.C. Code § 24-403.03(c)(10).  Under the plain language of this clause, the "diminished culpability" of an eligible movant is unconditional and categorical.  Factor ten does not, for example, ask the court to consider "whether the hallmark features of youth played a role in the offense" or "whether the movant exhibited diminished culpability as a result of his or her youth."  Rather, the Council framed the hallmark features of youth as axiomatically weighing in favor of the movant.  When the Council intended to qualify a factor under the IRAA, it did so.  *See, e.g.*, D.C. Code § 24-403.03(c)(3) ("*Whether* the defendant has substantially complied with the rules of the institution . . . .") (emphasis added); (c)(5) ("*Whether* the defendant has demonstrated maturity, rehabilitation, and a fitness to reenter society . . . .") (emphasis added); (c)(9) ("*The extent* of the defendant's role in the offense . . . .") (emphasis added).  Factor ten, meanwhile, takes as a given the movant's "diminished culpability" and the existence of the "hallmark features of youth, including immaturity, impetuosity, and failure to appreciate risks and consequences, which counsel against sentencing [movants] to lengthy terms in prison," D.C. Code

§ 24-403.03(c)(10), and simply requires the trial court to consider that fact in its overall assessment whether to grant relief.

This result also follows naturally from one of the central purposes of the IRAA: to provide sentencing relief to a class of incarcerated individuals who committed crimes at a time when, by definition, their neurological development was incomplete. The IRAA rests on the premise that juveniles and young adults are not cognitively different from older adults only *at certain times* or *under certain circumstances*. In the Committee's reading of the scientific evidence, a diminished capacity to "control executive functions like planning, working memory, and impulse control" and the propensity to engage in "novelty seeking [and] increased risk taking" are part and parcel of what it is to be a juvenile or young adult. 2016 Committee Report at 3. Nothing about the Committee's rationale or the IRAA's scientific foundation suggests that each movant or underlying offense should be screened for the presence of the "hallmark features of youth." *Cf. Roper v. Simmons*, 543 U.S. 551, 571 (2005) ("Once the diminished culpability of juveniles is recognized, it is evident that the penological justifications for [capital punishment] apply to them with lesser force than to adults."). All of this is to say that factor ten

must weigh categorically in favor of the movant, regardless of whether the movant's "personal circumstances" further support an aging out of crime.[10]

One could still argue that, even if the first clause of factor ten must always count in favor of the movant, its *weight* should vary based on the defendant and the circumstances of the offense. One could posit, for example, that a twenty-three-year-old who acted with premeditation was less influenced by the hallmark features of youth than a sixteen-year-old who acted in the heat of the moment. The trial court here appeared to subscribe to this view, noting that, while "Mr. Bishop's age and circumstances at the time of the offense surely contributed to his actions that day," "Mr. Bishop's record of violence and criminality before, and particularly, after the day of the offense weigh, to some degree, against a finding of mere youthful impulsiveness." Thus, in the trial court's view, Mr. Bishop's record of violence before and after the underlying offense suggested that he committed the shooting for reasons other than "mere youthful impulsiveness."

---

[10] Our holding does not detract from the IRAA's overall "individualized" focus, as the government suggests. 2020 Committee Report at 14. The vast majority of the remaining ten factors focus largely or exclusively on the movant, either before or after the offense. Additionally, as noted above, factor ten is individualized in that a movant's "personal circumstances" may support an "aging out of crime." D.C. Code § 24-403.03(c)(10).

Largely for the reasons mentioned above, we conclude that the IRAA does not contemplate trial courts making case-by-case determinations of the degree to which the underlying offense was motivated by the "hallmark features of youth." Such an inquiry runs counter to the plain language of factor ten. In particular, unlike nearly all of the other statutory factors, the first clause of factor ten does not instruct the trial court to consider the reduced culpability of the individual movant. Rather, it applies broadly to the class of individuals under twenty-five. The Council therefore did not intend an individualized assessment of a particular movant's reduced culpability. Nor can we discern anything in the IRAA's legislative history that suggests that the Council anticipated such an approach.

Nor can a movant's "record of violence and criminality" before or after the underlying offense serve as a reliable proxy for his or her maturity at the time of that offense. Other crimes committed before the movant turned twenty-five may have been caused by the same "transient immaturity," *id.*, at play in the underlying offense; crimes committed after that age tell us little about the movant's previous level of maturity.[11]

---

[11] This is not to suggest that evidence of premeditation or the movant's record of violence before or after the underlying offense are wholly irrelevant to an IRAA inquiry. We hold only that such considerations are inappropriate under the first

In sum, we hold that factor ten must weigh categorically in favor of the movant and that the trial court may not inquire, on a case-by-case basis, whether or to what extent the "hallmarks of youth" played a role in the underlying offense. The court may, however—consistent with the second clause of factor ten—consider the extent to which a movant's personal circumstances support an aging out of crime. And, of course, in its ultimate determination of dangerousness and the interests of justice, the court may determine that, notwithstanding the diminished culpability of persons under twenty-five, the Section 24-403.03(c) factors overall weigh against granting relief.

### 3. Whether the Trial Court Failed to Consider Mr. Bishop's Reduced Culpability in its Interests-of-Justice Analysis

The IRAA instructs courts to "reduce a term of imprisonment imposed" on an eligible movant if "[t]he court finds, after considering the factors set forth in subsection (c) . . ., that the defendant is not a danger to the safety of any person or the community and that the interests of justice warrant a sentence modification." D.C. Code § 24-403.03(a)(2). The trial court concluded that the interests of justice did not warrant a sentence modification for Mr. Bishop. The court acknowledged

clause of factor ten. Furthermore, to be clear, we are interpreting the intent of the D.C. Council as it pertains to the IRAA. We do not suggest that trial courts cannot make individualized assessments of youthful impulsiveness or the lack thereof in other contexts, including sentencing.

"that Mr. Bishop has served almost three decades and nearly his entire adult life in prison." The court balanced this finding, however, against the "heinous, violent" nature of Mr. Bishop's crimes, the "continu[ed] trauma" expressed by Mr. Harley and Mr. Newton's family, and Mr. Bishop's disciplinary record while incarcerated. The court "ultimately [found] that, because Mr. Bishop has not demonstrated that he is not presently a danger to society, it would not be in the interest of justice to grant" his motion. It did not expressly address how Mr. Bishop's "diminished culpability" factored into its analysis.

Mr. Bishop asserts that the trial court neglected to "acknowledge [his] individualized diminished culpability" in its interests-of-justice analysis. Additionally, Mr. Bishop argues that the trial court neglected to include findings it had made under several of the enumerated factors. For example, "although the trial court made findings related to factors 1, 2, and 8 about [Mr.] Bishop's age; emotional trauma; and lack of family support, positive adult influence, and educational structure," it failed to mention these characteristics in its interests-of-justice analysis. Similarly, Mr. Bishop argues that the trial court failed to acknowledge that Mr. Brown also played a role in the offense, and the "poor decision-making ability of [young adults like Mr. Bishop] is often compounded when they act in concert with others."

We cannot say that the trial court abused its discretion in omitting mention of Mr. Bishop's "individualized reduced culpability" in its interests-of-justice analysis. As Mr. Bishop concedes, the trial court "made findings related to factors 1, 2, and 8 about [his] age; emotional trauma; and lack of family support, positive adult influence, and educational structure[.]" But Mr. Bishop sells the trial court short: not only did it "ma[ke] findings" as to these factors, it weighed them in his favor. *See, e.g.*, Order at 9 ("[I]t appears that Mr. Bishop did not have a highly structured or stable home environment and had experienced a notable amount of neglect throughout his childhood."); *id.* at 21-22 ("This [childhood] trauma cannot be divorced from the violence that Mr. Bishop was convicted of committing as a nineteen-year-old man."). As reflected throughout its detailed discussion, the trial court remained attuned to Mr. Bishop's young age and the adverse circumstances confronting him at the time of the offense.

Although it would perhaps have been preferable to expressly acknowledge Mr. Bishop's reduced culpability or other specific findings in its interests-of-justice analysis, the trial court undoubtedly took Mr. Bishop's diminished culpability into account—even if it did so using an incorrect version of factor ten. Viewing the order as a whole, the trial court adequately considered Mr. Bishop's diminished culpability. It would be unduly formulaic to require a recitation of each and every finding in the trial court's concluding paragraphs. *See Johnson*, 398 A.2d at 366

("[W]e are prepared to countenance imperfections in the trial court's exercise of discretion to enjoy more fully the advantages of making the determination discretionary."). Under Section 24-403.03(a)(2), a trial court is not obligated to recount every detail of its preceding analysis, ultimately resolve every dispute of fact, or restate the weight ascribed to every factor. So long as the order demonstrates that the court adequately "consider[ed]" each of the eleven factors and clearly states the critical facts and reasons supporting its dangerousness and interests-of-justice analyses, and those facts and reasons are supported by the record, the court does not abuse its discretion under Section 24-403.03(a)(2). We are satisfied that the court fulfilled those obligations here.[12]

---

[12] Mr. Bishop incorrectly asserts that the trial court failed to take into consideration that Mr. Brown's participation in the shooting "compounded" Mr. Bishop's "poor decision-making ability." Under factor seven, the court recognized that, although "the evidence introduced against Mr. Brown was more substantial than the evidence against Mr. Bishop," the jury nevertheless convicted Mr. Bishop of "a deliberate act of violence that culminated in the death of Mr. Newton and the injury of four others." Although the court perhaps should have expressly acknowledged that juveniles and young adults exhibit heightened "susceptibil[ity] to negative influences and outside pressures, including peer pressure," *Roper*, 543 U.S. at 569, it appropriately considered "the extent of [Mr. Bishop's] role in the offense" by reviewing the evidence presented at trial. D.C. Code § 24-403.03(c)(9). At any rate, as above, the court need not specifically reference its findings as to factor nine in its interests-of-justice analysis.

We are similarly unpersuaded by Mr. Bishop's claim that the trial court failed to "make the necessary findings to enable its proper consideration" of his forensic

**4.    Whether the Trial Court Improperly Relied on the Violent Nature of the Underlying Offense in Denying Mr. Bishop's Motion**

Mr. Bishop asserts that the trial court "abused its discretion when it placed substantial weight on the nature of [his] crimes of conviction to find that he had neither shown a lack of current dangerousness nor established that relief is in the interests of justice." In particular, Mr. Bishop cites two sentences in the trial court's order. First, in its dangerousness analysis, the trial court wrote that, "[i]n sum, while aspects of Mr. Bishop's record while incarcerated evidence his rehabilitation, the Court finds that the evidence . . . is insufficient to outweigh the violence of the offenses for which he was convicted and his disciplinary history while incarcerated." Second, in its interests-of-justice analysis, the court acknowledged that "Mr. Bishop has served almost three decades and nearly his entire adult life in prison" but weighed that fact against the "heinous, violent acts" for which Mr. Bishop was convicted. In Mr. Bishop's view, these passages "highlighted the violent, heinous

---

mental health report under its interests-of-justice or dangerousness analysis. Mr. Bishop fails to state with particularity what "necessary findings" the trial court should have made or what the likely impact of those findings would have been. More fundamentally, Mr. Bishop again misapprehends the trial court's obligations under Section 24-403.03(a)(2): it need not expressly include its findings about factor three in that portion of its order.

nature of the offenses not as a baseline to assess growth but as a heavy weight against relief[.]"

In light of the fact that we are remanding for reconsideration with a proper application of factor ten, we need not address Mr. Bishop's argument. We note, however, that a trial court deciding an IRAA motion "may consider any records related to the underlying offense," D.C. Code § 24-403.03(a)(2)[13]; that factor eleven permits consideration of "[a]ny other information the court deems relevant to its decision," *id*. § 24-403.03(c)(11); and that the interests of justice can encompass the nature of the underlying crime. That said, we encourage trial courts to bear in mind that the D.C. Council removed language in factor three instructing courts to specifically consider the "nature of the offense," *compare* D.C. Code § 24-403.03(c)(3) (2017) *with* D.C. Code § 24-403.03(a)(2) (2019); expressed concern with an "over-reliance on the underlying offense" as a reason for "denying

---

[13] In its 2020 revisions to the IRAA, the Council amended Section 24-403.03(b)(2) to provide that a trial court "may consider any records related to the underlying offense." *Compare* D.C. Code § 24-403.03(a)(2) (2019) *with* D.C. Code § 24-403.03(a)(2) (2021). In doing so, the Council intended to give courts latitude to "consider[ ] the facts and circumstances surrounding the underlying offense through its review of the various factors and evidence, including the pleadings, case files, the defendant's testimony, the government's position, and the testimony of the survivor[s] of the crime." 2020 Committee Report at 18. Indeed, "[t]he Committee is clear that the facts and circumstances of the underlying offense are interwoven throughout the statute, but to be explicit on this point, the Committee" included the aforementioned amendment. *Id.* at 19.

petitions of potentially rehabilitated defendants," 2020 Committee Report at 19; noted that "[i]ndividuals eligible to petition for relief under the IRAA have *all* served long sentences for *exclusively* serious offenses," *id*.; and made clear in factor ten that courts must consider the diminished culpability of those under age twenty-five "despite the brutality or cold-blooded nature of any particular crime," D.C. Code § 24-403.03(c)(10).

## IV.    Conclusion

We conclude that a remand is necessary for the trial court to reconsider its order in light of the foregoing discussion.  Accordingly, the trial court's order is hereby vacated and the matter remanded for further proceedings consistent with this opinion.

*So ordered.*